# United States Court of Appeals
## For the First Circuit

No. 20-1984

SANDRA COLMAN LERNER,

Plaintiff, Appellant,

v.

STEPHEN J. COLMAN; DANIEL J. FLYNN, III; JAMES F. CANAVAN; LISA
LABRIQUE; ELIZABETH COLMAN; KAREN REIDY; KIRSTEN HUNT; WILLIAM
CHRISTOPHER COLMAN,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson and Kayatta, Circuit Judges.

Michael F. Connolly, with whom William D. Black and Rubin and
Rudman, LLP were on brief, for appellant.
Dana A. Curhan for appellee Stephen J. Colman.
Andrew C. Oatway for appellee James F. Canavan, who joined in
appellee Stephen J. Colman's brief and argument.

February 17, 2022

**KAYATTA**, **Circuit Judge**. This lawsuit arises out of a dispute concerning the disposition of assets once held by the uncle of the two principal protagonists in this case, plaintiff Sandra Colman Lerner ("Lerner") and her cousin, defendant Stephen Colman ("Stephen").[1] Because Lerner and Stephen are both citizens of the Commonwealth of Massachusetts, this lawsuit claimed a place on the docket of the United States District Court only because Lerner attempted to plead claims under the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962, 1964(c), to which she has appended state law claims for fraud and breach of fiduciary duty. The district court found that the complaint failed in its effort to plead RICO claims. With the federal claims removed from the case, the district court then dismissed the state law claims without prejudice to their refiling in state court. Lerner now appeals, arguing that her complaint adequately stated a cause of action under RICO. For the following reasons, we affirm the judgment of the district court that this dispute belongs in a state court, not in a federal court.

---

[1] We use first names to distinguish between the two Colmans prominent in the case's factual background: Stephen Colman and his uncle, Bill Colman.

**I.**

**A.**

Because we are reviewing an order dismissing a complaint for failure even to state a claim, we assume -- without deciding -- that the properly pleaded facts are true. Home Orthopedics Corp. v. Rodríguez, 781 F.3d 521, 527 (1st Cir. 2015). Those facts begin with a description of the conduct directly injuring Lerner, centering on events surrounding the death of Lerner and Stephen's uncle, Bill Colman ("Bill"). Borrowing from the complaint, we refer to these events as "the Solar Resources Scheme."

In 2003, Bill founded a company called Solar Resources, Inc. to develop land in Utah for salt extraction. About two weeks before Bill died in December 2011, Stephen allegedly caused a valuable water right in Utah to be transferred, without Bill's authorization, from Bill's personal ownership to Solar Resources. After Bill died without a will, Stephen became the personal representative of Bill's estate, with sole control of his assets. Bill's heirs by the laws of intestacy are Lerner, Stephen, and Bill's ten other nieces and nephews.

In the weeks that followed Bill's death, Stephen completed the transfer of the water right to Solar Resources by filing various materials with the Utah Division of Water Rights, including an Assignment of Water Right that contained an allegedly forged signature of Bill Colman. Accordingly, Bill's estate at

- 3 -

the time of probate no longer included the water right, and the right was not distributed to his heirs directly.

According to the complaint, also following Bill's death, Stephen caused more than fifty percent of the shares of Solar Resources to be transferred to himself, his siblings, Bill's former wife, and Stephen's longtime friends and business associates James Canavan and Daniel Flynn -- none of whom paid a "fair" price, if any, for their shares. Lerner alleges that Canavan and Flynn knew or had reason to know that the Solar Resources stock was fraudulently obtained, but she stops short of alleging that they played any particular role in these events. By contrast, her complaint alleges that Stephen prepared various falsified documents to effectuate the stock transfers, including falsified checks and back-dated stock certificates.

Solar Resources was later sold in December 2012 for $11 million, with Stephen receiving $2.5 million for his shares alone. The proceeds from the 46.5% of the shares that continued to be held by Bill's estate were distributed to his heirs as a major component of the estate.

Finally, Lerner alleges that Stephen concealed the nature of the stock transactions from her and the other heirs to induce their consent to the sale of Solar Resources. His cover stories included telling the other heirs that the stock transfers were disbursements for investments and telling Lerner that the

transfers had been gifts. Lerner only learned of the scheme in 2018, when one of her cousins told her about the "investment" cover story.

As a result of Stephen's maneuvers, Lerner contends that she missed out on a larger inheritance from Bill Colman's estate, both because Stephen prevented the water right from being directly distributed to the heirs and because he reduced by more than half the proportion of Solar Resources' value that should have passed through the estate.

**B.**

Stephen's conduct that directly affected Lerner ended with the diminishment of her inheritance brought about by the Solar Resources Scheme. The complaint, though, alleges four other illicit schemes carried out (to varying extents) by Stephen, with Canavan and Flynn, over the course of fifteen years. These schemes caused no direct harm to Lerner. Rather, she says that they demonstrate a pattern of fraudulent business activities that included the Solar Resources Scheme and that is sufficient to bring Stephen and his companions within the purview of RICO as a "criminal enterprise."

The first alleged scheme took place from April 1999 through at least June 2000. In this "Patriot Investments Scheme," Flynn approached an investor named George Brewster and successfully solicited nearly $1.5 million in investments to

purchase and develop properties. In exchange for one of these investments, Flynn gave Brewster a promissory note for $450,000. Lerner alleges that the specific real estate project advertised to Brewster never actually existed and that a similarly named venture, managed by Stephen, received the invested funds instead.

Second, the complaint describes a scheme whereby Flynn allegedly abused his role as a listing agent for a property on East Howard Street in Quincy (the "East Howard Scheme"). In 2002, Flynn, on behalf of his company Daniel J. Flynn & Co. (DJFCO), agreed to advertise and attempt to sell the East Howard Street property as the agent of the seller, a business called LINC Property I, LLC. In early 2003, LINC agreed to sell the property for $825,000 to a trust of which Canavan was the trustee and in which Flynn held an undisclosed interest. Flynn then induced an unwitting investor -- again, George Brewster -- to give Canavan funds for the purchase of the East Howard Street property, but he told Brewster that the price was $1,325,000. Flynn allegedly pocketed both the $500,000 upcharge and the commission on the actual sale value without informing LINC of the higher value received for the property or informing Brewster of the lower cost Canavan's trust had actually paid for it. According to the complaint, after Brewster learned that the true sales price was $500,000 less than he had paid Canavan, Brewster filed suit against Flynn, Canavan, and Stephen.

Third, from 2008 through at least April 2012, Flynn allegedly misled a group of investors in what we will call the "DJF Fund Scheme." Flynn solicited twenty-five limited partners for the DJF Real Estate Opportunity Fund 1, L.P. ("DJF Fund") in 2008 and provided periodic updates between 2010 and 2012. Flynn and Stephen allegedly drafted false promissory notes purporting to reflect debts owed to the DJF Fund and prepared materials for the limited partners representing that the DJF Fund held these notes as assets. Eventually, many of the limited partners filed suit against Flynn and DJFCO alleging a combined loss of more than $9 million.

Fourth, the complaint describes a multiyear Ponzi scheme -- dubbed "the Greenleaf Property Scheme" -- which began circa 2008. The complaint alleges that Flynn induced several rounds of investors to loan money to the DJF Fund for the purchase and development of a building on Greenleaf Street in Quincy -- a building, Lerner claims, that Flynn had already purchased in 2005. Flynn, Stephen, and Canavan then allegedly used these funds to repay other investors and victims from other schemes. At least some of the Greenleaf Property investors received promissory notes purportedly drafted by Canavan or Stephen, the latter of whom also allegedly drafted fraudulent purchase and sale agreements as in-house counsel for DJFCO. The complaint states that several of

these investors, too, sued Flynn upon learning he already owned the Greenleaf Property.

Finally, as an epilogue to this narrative, the complaint recounts that Flynn was indicted in 2015 for federal mail and wire fraud offenses stemming from conduct spanning from 2007 to the indictment. Flynn ultimately pleaded guilty to all charges and agreed to pay millions of dollars in restitution to seventy-three victims.

## C.

Lerner brought this suit seeking treble damages under RICO from Stephen, Flynn, and Canavan (the "enterprise defendants") for the losses she suffered from the Solar Resources Scheme. Her complaint includes three RICO counts, alleging violations of 18 U.S.C. § 1962(c) (conducting a racketeering enterprise), § 1962(a) and (b) (using racketeering income and acquiring control of a business through racketeering, respectively), and § 1962(d) (RICO conspiracy). Lerner also brought Massachusetts state-law claims for fraud and breach of fiduciary duties against Stephen, and a claim for "money had and received" against his siblings, all arising out of the Solar Resources Scheme.

The defendants moved to dismiss Lerner's complaint. The district court issued a detailed opinion granting the motion, finding, as relevant to this appeal, that the civil RICO statute's

carve-out of securities-fraud schemes forecloses Lerner's reliance on all but the Solar Resources Scheme, and that that scheme, standing alone, was insufficient to make out a RICO claim. Without any federal claims remaining, the district court then declined to exercise supplemental jurisdiction over the state-law claims, thus dismissing those as well. Lerner timely appealed.

## II.

We review the grant of a motion to dismiss de novo, accepting the facts as pleaded in the complaint "to determine whether the plaintiff has stated a plausible claim for relief." Home Orthopedics, 781 F.3d at 527.

The crux of this appeal is the viability of Lerner's RICO claims. Absent these federal claims, Lerner can point us to no reason why the district court's decision dismissing the state-law claims without prejudice would be improper. See 28 U.S.C § 1367(c); Lambert v. Fiorentini, 949 F.3d 22, 29 (1st Cir. 2020) ("As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit . . . will trigger the dismissal without prejudice of any supplemental state-law claims." (alteration in original) (quoting Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995))). We therefore begin with some background on the RICO statutory regime before turning to the specific claims on appeal.

The RICO statute prohibits those "associated with any enterprise" that operates in interstate commerce from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). That primary criminal provision has a civil companion in section 1964, which provides a cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter" to recover treble damages. Id. § 1964(c).

Thus, to state a civil RICO claim, a plaintiff must allege "a violation of section 1962" and an injury "by reason of" that violation. Id. The underlying section 1962 violation in turn requires demonstrating: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985) (footnote omitted). The statute separately defines "pattern of racketeering activity" to require "at least two acts of racketeering activity." 18 U.S.C. § 1961(5).

In 1995, Congress limited prospective plaintiffs' ability to use the RICO statute as a basis for civil suits alleging fraud in the purchase or sale of securities. See Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, § 107, 109 Stat. 737, 758 (Dec. 22, 1995) (the "PSLRA"). As amended by

the PSLRA, the pertinent language of RICO section 1964(c) now reads:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, <u>except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962</u>.

18 U.S.C. § 1964(c) (emphasis added).

The PSLRA added both the exception quoted above (which we call the "PSLRA bar"), and an exception-to-the-exception (the "conviction exception"), which proceeds from the language quoted above: "The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud." 18 U.S.C § 1964(c). The district court found the conviction exception inapplicable here, and Lerner has not developed any arguments challenging that conclusion on appeal. Any such argument is thus waived, so we express no view on the district court's read of the conviction exception. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

- 11 -

Lerner argues, instead, that the district court erred in interpreting the PSLRA bar to exclude most of her alleged predicate schemes. Second, Lerner argues that even if the district court's interpretation was proper, the court nonetheless erred in applying the bar to exclude the East Howard Scheme, which, Lerner posits, should qualify under even the district court's more restrictive view of the statute. Finally, she argues that she has sufficiently pleaded a RICO violation, even if only a smaller number of her predicate schemes may be counted.[2] We consider these arguments in turn.

## A.

We first consider Lerner's argument that the district court misinterpreted the PSLRA bar. Again, the statute provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to

---

[2] In addition to these primary arguments, Lerner also contends that the district court specifically erred in dismissing the section 1962(b) business-control claim and the section 1962(d) RICO-conspiracy claim. However, Lerner does not and cannot argue that these claims would survive if her complaint failed to allege an underlying pattern of racketeering activity. See 18 U.S.C. § 1962(b) (making it unlawful for a person to acquire an interest in an enterprise "through a pattern of racketeering activity"); Efron v. Embassy Suites (P.R.), Inc., 223 F.3d 12, 21 (1st Cir. 2000) ("[I]f the pleadings do not state a substantive RICO claim upon which relief may be granted, then the [section 1962(d)] conspiracy claim also fails."). Thus, in light of our ultimate finding that Lerner has not sufficiently pleaded a pattern of racketeering activity, we need not consider these arguments separately.

establish a violation of section 1962." 18 U.S.C. § 1964(c). The district court concluded that this language bars Lerner from relying on conduct that would have been actionable as securities fraud, whether or not Lerner herself could have commenced such an action. Lerner argues that it should be read more narrowly, barring her reliance only on conduct that would have supported a securities fraud action brought by Lerner herself.

This distinction is relevant here because the district court found that four of Lerner's alleged schemes -- all but the Solar Resources Scheme -- could have formed the basis for securities fraud actions by proper plaintiffs, though all parties agree that Lerner herself would not have had standing to bring those actions because she was not injured by those schemes.[3] With the district court's more expansive view of the PSLRA bar, Lerner was prohibited from relying on these schemes as predicate acts, which ultimately proved fatal to her suit below. For the following reasons, we agree with the district court that the better read of the statute bars reliance on conduct actionable as securities fraud, regardless of who could have brought such an action.

---

[3] The district court provided Lerner with the opportunity to amend her complaint and re-plead the schemes in the alternative as securities fraud. However, Lerner informed the court that she could not see a meritorious basis for bringing such claims.

**1.**

In interpreting section 1964(c)'s PSLRA bar, we begin with the language of the statute. See United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989); Woo v. Spackman, 988 F.3d 47, 50-51 (1st Cir. 2021). Tellingly, the PSLRA employs language that is most naturally read as allowing "no person" to rely on "any conduct that would have been actionable." To succeed, Lerner would have us write into the statute a qualification that the conduct must be actionable in a suit brought by the particular person who now wishes to rely on that conduct to bring a RICO claim. Or, more concisely, Lerner needs us to read the bar as applying only to RICO plaintiffs who could have maintained a securities-fraud action against the defendant. It would have been quite simple for Congress to have so stated if that were its intent. Instead, the combined use of "no person," "any conduct," and the passive modifying phrase "would have been actionable" to describe a characteristic of the conduct rather than the person, all combine to make Lerner's preferred reading at best a stretch.

Nor are we the first circuit to read this language as not restrained in the manner Lerner would prefer. The Second Circuit relied on this express, expansive language to hold that "section 107 of the PSLRA bars civil RICO claims alleging predicate acts of securities fraud, even where a plaintiff cannot itself pursue a securities fraud action against the defendant," because

"the plain language of the statute 'does not require that the same plaintiff who sues under RICO must be the one who can sue under securities laws.'" MLSMK Inv. Co. v. JP Morgan Chase & Co., 651 F.3d 268, 277-78 (2d Cir. 2011) (quoting In re Enron Corp. Sec., Deriv. & ERISA Litig., 284 F. Supp. 2d 511, 620 (S.D. Tex. 2003)); see also Howard v. Am. Online Inc., 208 F.3d 741, 749-50 (9th Cir. 2000) (reaching the same conclusion).

The broader reading of the PSLRA bar finds reinforcement in the structure of the statute and its relationship with the criminal provision in section 1962. As we noted above, section 1964(c) has two baseline requirements: "injury" and "a violation of section 1962." The injury is conceptually distinct from the violation itself because it must be suffered "by reason of" the violation. 18 U.S.C. § 1964(c). As between these two elements, the PSLRA bar refers to only one, and it does so expressly: "[N]o person may rely upon any conduct . . . to establish a violation of section 1962." Id. The bar is thus not concerned with whatever universe of conduct is specific to the RICO plaintiff's injury, but with the broader universe of conduct that would be necessary to "establish" the underlying violation.

Further, by training on the "conduct" used to establish the "violation of section 1962," section 1964(c) also incorporates the meaning of "conduct" as that word is used in section 1962, i.e., the "conduct of [the] enterprise's affairs through a pattern

- 15 -

of racketeering activity." Id. § 1962(c). That conduct is proved through a series of predicate acts, which need not each specifically injure the RICO plaintiff. See Camelio v. Am. Fed'n, 137 F.3d 666, 669 (1st Cir. 1998) ("[T]he injuries of which the plaintiff complains [must have been] caused by one or more of the specified acts of racketeering." (emphasis added)); accord GE Inv. Priv. Placement Partners II v. Parker, 247 F.3d 543, 548 (4th Cir. 2001) ("[P]laintiffs properly may allege acts of related fraud against other victims to establish a pattern of racketeering activity."). Accordingly, all alleged predicate acts upon which a putative RICO plaintiff seeks to rely are properly subject to scrutiny for compliance with the PSLRA bar, regardless of whom they injured.

Nor does the legislative history cause us to question whether we have read the statutory text correctly. The discussion of the PSLRA bar in the conference committee report states that Congress "intend[ed] this amendment to eliminate securities fraud as a predicate offense in a civil RICO action," and to end "plead[ing of] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." H.R. Rep. No. 104-369, at 47 (1995) (Conf. Rep.), as reprinted in 1995 U.S.C.C.A.N. 730, 746 (emphases added). Nothing in these categorical statements could reasonably be read to suggest

an intent to eliminate securities fraud as a predicate offense only when pleaded by certain plaintiffs.

**2.**

Lerner's attempt to counter the import of the foregoing text and history draws heavily from <u>Menzies</u> v. <u>Seyfarth Shaw LLP</u>, 197 F. Supp. 3d 1076 (N.D. Ill. 2016), <u>aff'd in part on other grounds</u>, 943 F.3d 328 (7th Cir. 2019). The analysis in that case (as in Lerner's brief) proceeded by breaking section 1964(c) in two: the original "rule" providing a cause of action and the new "exception" created by the PSLRA bar. <u>Id.</u> at 1105. <u>Menzies</u> then reasoned that exceptions must be interpreted as subsets of the rules they're hewn from, so in the context of section 1964(c), the "person[s]" constrained by the PSLRA bar must refer only to some group among the "person[s]" that otherwise could bring claims under "the rule." <u>Id.</u>

From this principle, <u>Menzies</u> -- and Lerner -- then make the critical leap in the analysis by concluding that because "the rule" grants an action only to those persons who have been injured by a RICO violation, the PSLRA bar's restriction of conduct must be limited in the same manner, such that it restricts a plaintiff's pleading only as to the specific conduct that injured the plaintiff:

> [T]he person must first have been "injured in <u>his</u> business or property by reason of a violation of § 1962" in order to fall within

- 17 -

the general rule of § 1964(c). . . . A reading of the statute's plain language, then, shows that all "actionable conduct" within the RICO exception must constitute conduct that injured the plaintiff in his business or property in order for it to be relied upon by that "person" to establish a RICO violation. If the actionable "conduct" concept does not refer to the injurious conduct harming the business or property of the "person" in the "Rule" portion of § 1964(c), and instead somehow refers to conduct harming anyone generally, then the underlying conduct would not fall within the general "Rule" of § 1964(c) in the first place.

Id. at 1106.

Menzies and Lerner thus conclude that the statutory phrase "any conduct that would have been actionable as [securities] fraud," 18 U.S.C. § 1964(c), must mean conduct that (1) injured the plaintiff, and (2) would have been actionable as securities fraud. Menzies, 197 F. Supp. 3d at 1107. Accordingly, all such conduct would be actionable by the plaintiff or "via a public action filed by the SEC." Id.

This reasoning proceeds from an inaccurate assumption: that the "Rule" of 1964(c) somehow concerns only conduct that injures the plaintiff.[4] To the contrary, as noted above,

---

[4] Lerner's argument tracks Menzies on this point but reveals how nonsensical her position is: "The rule and exception in § 1964(c) are . . . concerned only with those predicate acts that proximately caused the plaintiff's injury and for which she is seeking a remedy -- they are not concerned with those other predicate acts that form a 'pattern of racketeering activity.'" To the contrary, the civil racketeering cause of action is very much concerned with patterns of racketeering activity. If the

satisfying the "Rule" of 1964(c) requires: (1) a violation of section 1962 -- which in turn requires a pattern of predicate acts -- and (2) an injury -- which can stem from just a single one of those predicates. See Camelio, 137 F.3d at 669-70 (citing Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 268 (1992)). By referring specifically to conduct that is used "to establish a violation of section 1962" -- and not, for example, conduct used "to establish injury" -- the PSLRA bar expressly contemplates restricting reliance on conduct beyond that which specifically injured the plaintiff.

Our view of the conduct's relationship to the injury also comports with a commonsense understanding of the statutory language. Simply because the "violation" must have injured the plaintiff in some respect, it does not follow logically that each constituent component of that violation -- i.e., all of the racketeering conduct -- must also have injured that plaintiff. Contra Menzies, 197 F. Supp. 3d at 1106 ("If the actionable 'conduct' concept does not refer to the injurious conduct . . . then the underlying conduct would not fall within the general 'Rule' of § 1964(c) in the first place."). In fact, Lerner's complaint has proceeded from the directly opposite understanding:

statute were "not concerned with" the four additional predicate schemes alleged in Lerner's complaint, as she argues, then why would she have alleged them?

To meet the requirements of section 1964(c)'s "Rule," she has alleged as predicate acts four schemes that, admittedly, did not injure her.

Nor does Lerner's effort to offer an alternative view of the legislative history provide a meaningful basis for her limited reading of the PSLRA bar. Lerner cites statements made by the RICO amendment's sponsors in the House of Representatives and the SEC chairman who testified at hearings on the bill, but those statements establish nothing more than that the speakers believed the securities laws provided adequate recompense "for those injured by securities fraud," such that affected plaintiffs need not resort to RICO actions for securities claims. See, e.g., S. Rep. No. 104-98, at 19 (1995), as reprinted in 1995 U.S.C.C.A.N. 679, 698.[5]

Lerner then concludes from this evidence that Congress intended merely to divert to the securities framework certain claims amenable to overlapping statutory realms, not to

_____

[5] Menzies went further than Lerner goes in examining the legislative history, citing competing versions of the RICO amendment introduced by the two chambers in addition to further statements from the floor. See 197 F. Supp. 3d at 1112-14. Nonetheless, the evidence marshalled there purports to establish nothing more than that the PSLRA bar was "designed to merely eliminate overlapping remedies under the securities laws and civil RICO." Id. at 1113. As explained below, this design is not inconsistent with the result that Congress both eliminated those overlapping actions and also prevented RICO plaintiffs from relying on securities fraud against other victims.

"[e]liminate [r]emedies for [v]ictimized [p]laintiffs." But, even if we accept that Congress may not have expressly stated an intention to foreclose a RICO remedy for plaintiffs in Lerner's precise position -- those who seek to invoke securities fraud affecting only other victims -- that does not constitute evidence that Congress affirmatively intended to preserve these niche claims. Moreover, the express and unqualified statements indicating that Congress intended to eliminate pleading of securities fraud as a predicate act, supra p. 16, speak more directly to the instant circumstances than do statements indicating Congress thought other remedies would be sufficient for securities-fraud victims.

### 3.

Before we move on, we respond briefly to the broader policy concern underlying Lerner's arguments about the PSLRA bar. Lerner, and Menzies before her, expresses consternation over the possible implication that the reading of the PSLRA bar we now adopt would foreclose remedies for "[v]ictimized [p]laintiffs." See, e.g., Menzies, 197 F. Supp. 3d at 1114 ("Nothing in the legislative history justifies the notion that, in eliminating an overlap, Congress intended to create a 'gap' in the remedial scheme such that real fraud victims would be denied any federal remedy under either [RICO or the securities laws]."). This concern is misplaced.

First, no party here disputes that potential RICO plaintiffs directly injured by conduct actionable as securities fraud can seek recourse in a federal securities-fraud action. Second, plaintiffs like Lerner will still presumably have, at least, state-law claims for whatever conduct actually injured them. Indeed, Lerner's complaint alleges such claims here (state-law breach of fiduciary duty and fraud). What may be foreclosed to plaintiffs in Lerner's position is only the "extraordinary remedy" of RICO. Efron v. Embassy Suites (P.R.), Inc., 223 F.3d 12, 21 (1st Cir. 2000) (quoting Menasco, Inc. v. Wasserman, 886 F.2d 681, 683 (4th Cir. 1989)).

In sum, we hold that the text of the PSLRA bar in section 1964(c) prohibits RICO plaintiffs from relying on as predicate acts any conduct that would have been actionable as securities fraud, regardless of whether the RICO plaintiff herself could have maintained that action.

**B.**

Having concluded that the PSLRA bar precludes Lerner's reliance on any predicate acts that would have been actionable as securities fraud, either by Lerner or anyone else, we now consider which among Lerner's alleged predicates would have been so actionable. We have said that determining what conduct is "actionable" for purposes of the PSLRA bar requires "a sort of reverse Rule 12(b)(6) inquiry." Calderón Serra v. Banco Santander

P.R., 747 F.3d 1, 4 (1st Cir. 2014).  While section 1964(c) does not point to a specific statute for defining "fraud in the purchase or sale of securities," we have previously turned to section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and its companion SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, as our reference point for the PSLRA bar.  See Calderón Serra, 747 F.3d at 4.

A plaintiff must plead six elements to state a claim under Rule 10b-5: "(1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  Hill v. Gozani, 638 F.3d 40, 55 (1st Cir. 2011) (quoting ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008)).  Among these, the only element in dispute here is the required "connection with the purchase or sale of a security."[6]

Section 3(a)(10) of the Securities Exchange Act of 1934 lays out what constitutes a "security."  15 U.S.C. § 78c(a)(10).  As relevant here, the lengthy list of qualifying financial instruments includes "any note, stock, . . . [or] investment contract."  Id.  The Supreme Court has observed that, by this list, Congress "did not attempt precisely to cabin the scope" of the

---

[6]  It is no surprise that the other elements of securities fraud are not contested here, as the thrust of each alleged scheme is indisputably fraud of some sort.

securities laws, but "[r]ather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." Reves v. Ernst & Young, 494 U.S. 56, 61 (1990). Nonetheless, because Congress did not intend to regulate all fraud through the securities laws, the SEC and, ultimately, the federal courts, must "decide which of the myriad financial transactions in our society come within the coverage of these statutes." Id. (quoting United Hous. Found., Inc., v. Forman, 421 U.S. 837, 848 (1975)). Some instruments plainly fall within the statute, such as the typical "stock." Id. at 62. Others, such as "notes," are "relatively broad term[s]," and thus specific notes may require further scrutiny to determine if they are properly considered "securities." See id.[7]

Applying the security requirement to Lerner's five alleged schemes, four are easily resolved. The district court found that three schemes (the Patriot Investments, Greenleaf Property, and DJF Fund Schemes) all alleged some connection with the purchase or sale of various securities, and Lerner does not challenge those findings on appeal. Conversely, the district court credited Stephen's concession at argument below that the Solar Resources Scheme "did not involve the 'purchase or sale' of a

---

[7] Reves then proceeded to announce the test for determining whether a particular note is a security, which starts from the "presumption that every note is a security," before considering criteria for rebutting the presumption. 494 U.S. at 65–66.

security," and Stephen does not challenge that finding on appeal, thus preserving the Solar Resources Scheme for RICO consideration.[8]

Therefore, only the classification of the East Howard Scheme remains in dispute. The district court grouped this scheme with those of the Greenleaf Property and Patriot Investments, and the court collectively analyzed these schemes "under the standard from Reves that pertains to promissory notes," thus implicitly finding that each of these schemes, as alleged, involved fraud in connection with the purchase or sale of promissory notes. That approach made sense for the Greenleaf Property and Patriot Investments schemes, because the complaint specifically alleges that in both of those schemes the enterprise defendants issued promissory notes to investor victims. Lerner, however, contends that this approach was error as to the East Howard Scheme because the complaint did not allege the use of promissory notes (or any other financial instrument) in the execution of that scheme.

---

[8] The district court relied on Second Circuit precedent to treat the invocation of the PSLRA bar as an affirmative defense, such that Stephen could still argue at a later stage of the proceedings that the bar should block Lerner's reliance on the Solar Resources Scheme as well. See Gilmore v. Gilmore, 503 Fed. App'x 97, 99 (2d Cir. 2012) (unpublished) (assuming arguendo, as the parties had, that the PSLRA bar provides an affirmative defense and finding no abuse of discretion in permitting the defense to be first raised at summary judgment). As we ultimately conclude that the dismissal of Lerner's complaint was proper, we need not consider whether Stephen would have been able to invoke the PSLRA bar at a later stage.

Stephen fails to develop any response to this claim of error.[9] Upon our own review of the complaint, we agree with Lerner that the district court inaccurately construed the East Howard Scheme.

Again, we are bound at this stage by the facts as plausibly alleged in the complaint. Home Orthopedics, 781 F.3d at 527. The East Howard Scheme, according to the complaint, involved Flynn's abuse of his position as a listing agent for the seller of the property on East Howard Street. Flynn allegedly solicited an investor to provide funds to purchase the property, but he then lied to both the seller and the investor about the price to be paid for the property, so that he could pocket the difference. Critically, the complaint does not describe any financial instruments involved in this exchange, as the lone investor directly wired funds to defendant Canavan, in whose name the property was purchased, and the complaint does not indicate that the investor received a note or investment contract in return. Accepting as we must the complaint's stated facts, the district court's implicit finding to the contrary was apparently without basis. And without any meaningful effort by Stephen to develop any argument to the contrary, we are constrained to find that the

---

[9] Stephen's brief does include a section headed "The Four Claimed Predicate Acts Were Indeed Actionable As Securities Fraud," but this section merely quotes at length from the district court opinion and asserts -- without any citation to the record -- that of the three schemes considered together by the district court, "all three involved the issuance of promissory notes."

- 26 -

PSLRA bar does not foreclose Lerner's reliance on the East Howard Scheme.

## C.

In light of our conclusion that the Solar Resources and East Howard Schemes are not barred from consideration as RICO predicates, we turn finally to the question of whether Lerner's complaint, limited to those schemes, sufficiently alleges a RICO violation. In so doing, we focus on the requirement that Lerner plead "a violation of section 1962," 18 U.S.C. § 1964(c), which in turn requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity," Sedima, 473 U.S. at 496 (footnote omitted). "Racketeering activity" encompasses a long list of qualifying predicate offenses, including mail and wire fraud. 18 U.S.C. § 1961(1). And where, as here, a RICO complaint pleads mail and wire fraud as predicate acts, it adopts the heightened pleading requirement of Federal Rule of Civil Procedure 9(b), New England Data Servs., Inc. v. Becher, 829 F.2d 286, 290 (1st Cir. 1987), such that the plaintiff must "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b).

RICO's "pattern" element requires at least two such predicates. 18 U.S.C. § 1961(5). "However, while two predicate acts are necessary to form a RICO 'pattern,' they may not be sufficient unless they are both 'related' and 'amount to or pose

a threat of continued criminal activity.'"  Schultz v. R.I. Hosp. Tr. Nat'l Bank, N.A., 94 F.3d 721, 731 (1st Cir. 1996) (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239-40 (1989)). While these are distinct characteristics, here we can begin and end our discussion with the relatedness requirement.

Predicate acts of criminal conduct are sufficiently related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  H.J. Inc., 492 U.S. at 240 (internal quotation omitted).  In applying these factors, we frame our discussion -- as did the parties' briefing -- in terms of the relatedness of the two schemes, though we note that the inquiry is concerned with the relatedness of predicate acts, rather than schemes.  This distinction is only relevant to the extent the alleged schemes are not coextensive with predicate acts.  Lerner does contend on appeal that each of the remaining schemes involved "multiple discrete predicate acts of mail and wire fraud," but this is not borne out by her complaint.  In the complaint's discussion of the East Howard Scheme, it alleges but one wire or mail use (the investor victim's wiring funds to Canavan for the purchase), giving rise to the implication of but one wire fraud predicate for that scheme.[10]

---

[10] Aside from the implication of a lone wire fraud predicate for the East Howard Scheme, the complaint also alleges that the

- 28 -

Turning now to the relatedness factors, let us start with the participants. Lerner's complaint alleges a specific role for each of Flynn and Canavan in the East Howard Scheme (i.e., acting as the listing agent and purchasing the property, respectively). But, it fails to describe any such role for Stephen, stating simply: "Upon information and belief, [Stephen] Colman participated in the scheme." Such a conclusory allegation is plainly insufficient to satisfy the operative pleading standards. See Giuliano v. Fulton, 399 F.3d 381, 388 (1st Cir. 2005) (finding allegation that "[o]n multiple occasions" one defendant "consulted and communicated . . . with the other participants in the [racketeering enterprise]" were too vague to satisfy Rule 9(b) (first alteration in original)).

In contrast to the East Howard Scheme, the Solar Resources Scheme appears to have been executed solely by Stephen, with no specific conduct alleged for either Flynn or Canavan. To be sure, the complaint does allege that Canavan and Flynn benefited from the Solar Resources scheme by receiving the diverted Solar Resources stock and the proceeds from the company's sale, and that these defendants knew or had reason to know that their proceeds were procured by fraud. But even assuming that receipt of the ill-gotten stock was sufficient to make Flynn and Canavan

_____

scheme involved Flynn's breach of fiduciary duties, but that is not an eligible predicate offense. See 18 U.S.C. § 1961(1).

- 29 -

participants in the scheme, Stephen's siblings and Bill Colman's former wife -- each of whom also allegedly received Solar Resources stock for which they did not pay fair value -- would be participants in the Solar Resources Scheme to the same degree as were Flynn and Canavan. Lerner's complaint does not allege that the East Howard Scheme was likewise a Colman family affair. So, even taking a charitable view of the participants in the Solar Resources Scheme, we are left with just two schemes sharing, at best, only a partial overlap in the participants, with no common participants having a major role in both schemes.

As to the means of each caper, Lerner contends that the alleged schemes all involved the creation of fraudulent investment and transaction documents. To the contrary, while the Solar Resources Scheme did allegedly involve Stephen's creation of forged and fraudulent materials, the complaint does not allege that any fraudulent documents were created for the East Howard Scheme. In a letter to this court specifically addressing the question of whether these two schemes alone would be sufficient to make out a RICO pattern, the closest Lerner comes to articulating some other common method is that the schemes both "used fraudulent mailing and wires." But if the relatedness of predicates could be cast at such a high level of generality, the requirement would have lost all meaning. And we have previously cautioned that "RICO claims premised on mail or wire fraud must be particularly

scrutinized" because of the ubiquity of the use of wires and mails and the ease with which isolated frauds can be pleaded as patterns. Efron, 223 F.3d at 20. Accordingly, relatedness requires something more in common than the mere use of mails or wires.

Finally, as to the purposes and victims, it is true that the complaint alleges that both remaining schemes served to enrich the defendants at the expense of "unsuspecting third parties." Lerner, however, concedes that the victims of these two schemes are different. And for good reason: The East Howard Scheme allegedly targeted a lone investor and a commercial real estate entity in an arm's-length transaction with DJFCO, while the Solar Resources Scheme purportedly deprived certain of Stephen Colman's family members of their inheritance.

In view of the foregoing, taken together, we find that the complaint does not allege facts sufficient to plausibly connect the only two alleged schemes not subject to the PSLRA bar, leaving us with mere "isolated events." See H.J. Inc., 492 U.S. at 240; see also Apparel Art Int'l, Inc. v. Jacobson, 967 F.2d 720, 723 (1st Cir. 1992) ("[I]f the two separate [criminal] episodes take place several years apart and involve different victims, methods, purposes, and (almost all) participants, they may well lack the requisite 'racketeering' relationship to each other."). The RICO

claim therefore fails because Lerner has not alleged a pattern of racketeering activity.[11]

### III.

For the foregoing reasons, we **affirm** the judgment of the district court dismissing Lerner's complaint.

---

[11] The district court concluded that the Solar Resources Scheme, standing alone, presented no continuing threat of criminal activity and thus could not alone establish a RICO pattern. On appeal, Lerner does not separately contend that the district court erred in this conclusion, and we thus find no occasion to disturb the district court's sound analysis on this account.