**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 24-1043**

MSP RECOVERY CLAIMS, SERIES LLC, a Delaware series limited liability company; MSPA CLAIMS 1, LLC, a Florida limited liability company; MSP RECOVERY CLAIMS SERIES 44, LLC, a Delaware series limited liability company; MSP RECOVERY CLAIMS PROV, SERIES LLC, a Delaware series limited liability company; MSP RECOVERY CLAIMS CAID, SERIES LLC, a Delaware series limited liability company, on behalf of themselves and all others similarly situated,

        Plaintiffs - Appellants,

v.

LUNDBECK LLC, a Delaware corporation; CARING VOICE COALITION, INC., an Idaho non-profit corporation; THERACOM, LLC, an Ohio corporation; ADIRA FOUNDATION, f/k/a Facilitating Patient Health, a Virginia non-profit corporation,

        Defendants - Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  Henry E. Hudson, Senior District Judge.  (3:22−cv−00422−HEH)

Argued:  October 29, 2024        Decided:  February 26, 2025

Before DIAZ, Chief Judge, and WYNN and THACKER, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion.  Judge Wynn wrote the opinion, in which Chief Judge Diaz and Judge Thacker joined.

**ARGUED:** Samuel Robert Simkins, AKEEL & VALENTINE, PLC, Troy, Michigan, for Appellants.   Kolya David Glick, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C.; Raymond A. Cardozo, REED SMITH LLP, San Francisco, California, for Appellee. **ON BRIEF:** Shereef H. Akeel, Adam S. Akeel, Daniel W. Cermak, Hayden Pendergrass, AKEEL & VALENTINE, PLC, Troy, Michigan; John W. Cleary, MSP RECOVERY LAW FIRM, Coral Gables, Florida; David Hilton Wise, William N. Evans, WISE LAW FIRM, PLC, Fairfax, Virginia, for Appellants.  Thomas H. Suddath, Jr., Philadelphia, Pennsylvania, Douglas E. Pittman, REED SMITH LLP, Richmond, Virginia; Joshua M. Davis, Washington, D.C., Suneeta Hazra, Brian Williams, Denver, Colorado, Nicole L. Masiello, Laurel M. Ruza, Aidan Mulry, ARNOLD & PORTER KAYE SCHOLER LLP, New York, New York, for Appellees.

2

WYNN, Circuit Judge:

Plaintiffs are business entities that allegedly own recovery rights assigned to them by health insurers and other third-party Medicare payors ("Assignors"). Assignors reimbursed their enrollees for prescriptions of the specialty drug Xenazine. Plaintiffs allege that Defendants—the manufacturer of Xenazine (Lundbeck LLC), a specialty pharmacy (TheraCom, LLC), and two healthcare nonprofits (Caring Voice Coalition ("CVC") and Adira Foundation)[1]—colluded to artificially inflate the price and dispensed quantity of Xenazine in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and various state laws. As a result, Assignors were allegedly forced to reimburse an inflated volume of Xenazine prescriptions at supra-competitive prices.

The district court dismissed the putative class-action complaint with prejudice, holding that Plaintiffs did not and could not adequately allege that Defendants' conduct proximately caused Plaintiffs' injuries. We affirm, except as noted below.

I.

A.

The Medicare program offers government-administered healthcare (Medicare Parts A and B). In addition, it contracts with private health insurers to act as healthcare plan sponsors for Medicare-eligible beneficiaries (Medicare Parts C and D). Private plan sponsors may offer full-service health plans under the "Medicare Advantage" program

---

[1] CVC dissolved shortly before this action began and has not appeared. Adira was an alleged replica and successor of CVC; it appeared below, but has since dissolved. Lundbeck and TheraCom are the only defendants appearing in this appeal.

(Part C), or prescription drug coverage (Part D).

Plans under Medicare Parts C and D typically require their beneficiaries to share the cost of prescription drugs through deductibles, co-insurance, and/or co-payments. When a pharmacy receives a prescription and dispenses a drug, the patient pays the co-payment or co-insurance and the patient's plan sponsor reimburses the pharmacy for the balance of the drug's cost. The plan sponsor is partially reimbursed by the Medicare program, either by collecting a predetermined per-insured rate (under Part C) or through advance monthly payments based on the plan sponsor's per-member, per-month bid (under Part D).

In other words, the "purchase" of a prescription drug is "normally split three ways: the physician effectively makes the decision to buy the product; the health insurer effectively pays for it (although the patient is required to make a [co-payment]); and the patient owns and uses it." *Humana, Inc. v. Biogen, Inc.*, 666 F. Supp. 3d 135, 152 (D. Mass. 2023). Although the patient is the end user, "third-party payors" (private plan sponsors) are "the entities that actually pay for the drugs at issue," beyond the patient's cost-sharing obligation. *Id.* at 153.

Medicare's cost-sharing obligation functions as "a market safeguard against inflated prices." *OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees*, 70 Fed. Reg. 70623, 70626 (Nov. 22, 2005) ("2005 OIG Guidance"). Nevertheless, co-payments for specialty prescription drugs, particularly in the period before generic competitors emerge, are often prohibitively expensive for Medicare patients. Drug manufacturers seek to alleviate patients' out-of-pocket expenses—and preserve demand for their products—by donating money to nonprofits called Patient

4

Assistance Programs ("PAPs"), which offer co-payment assistance to qualifying patients.

The federal government considers PAPs an "important safety net [for] patients of limited means," but also warns of "the potential for fraud and abuse" if PAPs are not sufficiently independent from their pharmaceutical-industry donors. 2005 OIG Guidance at 70624. To protect the price-regulating function of co-payments, the federal Anti-Kickback Statute prohibits drug manufacturers from paying or otherwise compensating Medicare patients for purchasing their drugs.[2] *See* 42 U.S.C. § 1320a-7b(b).

In that regard, the Department of Health and Human Services Office of the Inspector General issued guidance in 2005 on how PAPs can serve Medicare patients without violating the Anti-Kickback Statute. *See* 2005 OIG Guidance at 70623–27. The guidance advised that no "pharmaceutical manufacturer" or "affiliate of the manufacturer" "exert[] any direct or indirect influence or control over [a PAP]"; that PAPs "award[] assistance in a truly independent manner and "without regard to the pharmaceutical manufacturer's interests"; and that a drug manufacturer "not solicit or receive data from [a PAP] that would facilitate the manufacturer in correlating the amount or frequency of its donations with the number of subsidized prescriptions for its products." *Id.* at 70626.

In 2014, amid increased public scrutiny of PAPs' potential influence on drug prices, the Office of the Inspector General issued updated guidance emphasizing the "risk of fraud,

---

[2] The Anti-Kickback Statute criminalizes "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly . . . to any person to induce such person . . . to purchase . . . any good . . . for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(B).

waste, and abuse with respect to Medicare and other Federal health care programs" and the need for a clear separation between PAPs and their donors. *Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs*, 79 Fed. Reg. 31120, 31120 (May 30, 2014).

B.

In this matter, drug manufacturer Lundbeck produces the specialty drug Xenazine, which treats involuntary muscle movements associated with Huntington's Disease. Xenazine's costly co-payments for Medicare patients were subsidized by CVC, which is a now-defunct PAP.

In 2016, the Department of Justice ("DOJ") began investigating the relationship between Lundbeck and CVC. It later alleged that "Lundbeck made donations to CVC and knowingly and willfully used CVC as a conduit to pay the [co-payment] obligations of Medicare . . . patients taking Xenazine for unapproved uses." J.A. 52[3] (quoting Settlement Agreement at 2, Ex. A to Compl., *MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 664 F. Supp. 3d 635 (E.D. Va. 2023) (No. 3:22-cv-422), ECF No. 1-2). DOJ claimed that Lundbeck, in an effort to increase Xenazine sales, funneled patients away from its free drug program for Xenazine and toward CVC, thereby increasing the number of Xenazine claims submitted to Medicare. And DOJ contended that "[d]uring the period of the alleged misconduct, Lundbeck raised the price of Xenazine at over 22 times the rate of overall inflation in the United States." DOJ Press Release at 2, Ex. B to Compl., *Lundbeck*, 664 F.

---

[3] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Supp. 3d 635 (No. 3:22-cv-422), ECF No. 1-3, *also available at* https://www.justice.gov/usao-ma/pr/three-pharmaceutical-companies-agree-pay-total-over-122-million-resolve-allegations-they [https://perma.cc/6V2V-EKJP]. According to DOJ, Lundbeck's donations violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), thereby defrauding Medicare in violation of the False Claims Act, 31 U.S.C. §§ 3729–33. In 2019, Lundbeck settled with DOJ for $52.6 million without admitting to any of the facts alleged.

DOJ's investigation was part of a wave of similar enforcement actions targeting alleged PAP kickback schemes, several of which resulted in multimillion-dollar settlements. This in turn prompted a wave of civil RICO suits alleging essentially the same conduct described in the DOJ settlements. Although some of these suits were brought by plan sponsors themselves, most were filed by the same plaintiffs who brought this suit (MSP Recovery Claims and related entities). These lawsuits have been nearly unanimously dismissed, albeit on varying grounds.[4]

---

[4] *Compare MSP Recovery Claims, Series LLC v. Jazz Pharms., PLC*, No. 5:23-cv-1591, 2024 WL 3511635 (N.D. Cal. July 22, 2024) (dismissing first amended complaint), *voluntarily dismissed* (Aug. 12, 2024), ECF No. 114; *id.*, No. 5:23-cv-1591, 2023 WL 8600708 (N.D. Cal. Dec. 12, 2023) (dismissing original complaint); *MSP Recovery Claims, Series LLC v. Pfizer, Inc.*, 728 F. Supp. 3d 89 (D.D.C. Mar. 30, 2024) (dismissing amended complaint); *id.*, No. 22-cv-1419, 2023 WL 2770432 (D.D.C. Apr. 4, 2023) (dismissing original complaint); *United Healthcare Servs., Inc. v. United Therapeutics Corp.*, No. 8:22-cv-2948, 2024 WL 1256266 (D. Md. Mar. 25, 2024) (dismissing RICO claims with prejudice); *Humana Inc. v. United Therapeutics Corp.*, No. 22-3211, 2024 WL 1256261 (D. Md. Mar. 25, 2024) (dismissing RICO claims with prejudice); *Humana, Inc. v. Biogen*, 666 F. Supp. 3d 135 (D. Mass 2023) (dismissing RICO claims with prejudice), *reconsideration denied*, No. 21-11578, 2023 WL 8374584 (D. Mass. Dec. 4, 2023), *aff'd sub nom. Humana Inc. v. Biogen, Inc.*, 126 F.4th 94 (1st Cir. 2025); *MSP Recovery Claims, Series LLC v. Actelion Pharms. US, Inc.*, No. 3:22-cv-7604, 2024 WL 3408221 (N.D. Cal. July 12, 2024) (dismissing RICO claims in second amended complaint with prejudice); *id.*,

C.

Plaintiffs in this matter are "collection agencies that specialize in recovering funds on behalf of various actors in the Medicare Advantage system." *MSP Recovery Claims, Series LLC v. ACE Am. Ins. Co.*, 974 F.3d 1305, 1308 (11th Cir. 2020). Plaintiffs' Assignors are private health insurers that provide Medicare benefits under Medicare Parts C and D.

On June 6, 2022, Plaintiffs filed a class-action complaint alleging violations of RICO and various state laws resulting from essentially the same scheme alleged by DOJ in the press release announcing its settlement with Lundbeck. According to the complaint, Lundbeck and CVC colluded with defendant TheraCom, a data-analysis company and specialty pharmacy, to inflate both the price and dispensed quantity of Xenazine. Lundbeck allegedly donated money to CVC on the understanding that it would be earmarked for

---

2023 WL 5725517 (N.D. Cal. Sept. 5, 2023) (dismissing first amended complaint); *MSP Recovery Claims, Series LLC v. Avanir Pharms., Inc.*, No. 8:22-cv-1026, 2023 WL 4162338 (C.D. Cal. May 19, 2023) (dismissing amended complaint with prejudice), *appeal voluntarily dismissed*, No. 23-55551, 2023 WL 11823367 (9th Cir. Nov. 28, 2023); *id.*, No. 8:22-cv-1026, 2022 WL 17220647 (C.D. Cal. Oct. 20, 2022) (dismissing RICO claims in original complaint); *MSP Recovery Claims, Series LLC v. Caring Voice Coal., Inc.*, 722 F. Supp. 3d 1296 (S.D. Fla. 2024) (recommending dismissal of second amended complaint with prejudice); *id.*, 2022 WL 3155035 (S.D. Fla. July 21, 2022) (recommending dismissal of first amended complaint), *report & recommendation adopted*, 2022 WL 4448256 (S.D. Fla. Sept. 23, 2022), *with MSP Recovery Claims, Series LLC v. Amgen Inc.*, No. 2:23-cv-3130, 2024 WL 3464410 (C.D. Cal. July 15, 2024) (denying motion to dismiss); *see id.*, No. 2:23-cv-3130 (C.D. Cal. Nov. 20, 2024), ECF No. 158 (continuing hearing on motion to certify interlocutory appeal to May 1, 2025).

Only one other federal appeals court has addressed one of these suits, affirming its dismissal. *See Biogen*, 126 F.4th at 98.

8

Xenazine co-payments. Meanwhile, TheraCom, through its Xenazine Information Center, referred underinsured patients to CVC to boost demand for Xenazine. TheraCom allegedly "facilitate[d] the transmission of information between Lundbeck and CVC" in order to "ensure that CVC used the purported 'donations' exclusively to pay for Xenazine co-payments," which allowed Lundbeck to perform return on investment calculations," in violation of the Anti-Kickback Statute and the Travel Act. J.A. 23.

According to Plaintiffs, this scheme violated RICO and various state consumer-protection and unjust-enrichment laws. Plaintiffs also alleged that CVC made fraudulent transfers to defendant Adira Foundation, and that Adira was jointly and severally liable to Plaintiffs as CVC's successor. Plaintiffs claimed that as a result of the alleged scheme, Assignors and putative class members were obligated to reimburse their enrollees for an "artificially increased quantity of dispensed Xenazine and [at] supra-competitive prices." J.A. 55. In addition to class certification, Plaintiffs sought "actual, consequential, compensatory, statutory, treble, punitive, and other damages," along with restitution and disgorgement. J.A. 102.

Lundbeck, TheraCom, and Adira filed separate motions to dismiss. The clerk entered default against CVC for failure to appear. A few months later, Adira filed articles of dissolution. Shortly thereafter, Plaintiffs moved for a temporary restraining order and preliminary injunction to prevent Adira from dissolving and divesting its assets during the pendency of the action (as CVC had done shortly before the Complaint was filed).

At a hearing on the motions to dismiss, Plaintiffs could not identify any specific Xenazine claim allegedly paid to any pharmacy by any named Assignor. Following

9

argument, Plaintiffs moved to supplement their Complaint with a spreadsheet containing internal client data purporting to identify representative claims.

On March 24, 2023, the district court denied Plaintiffs' motion for injunctive relief and dismissed the complaint with prejudice. *Lundbeck*, 664 F. Supp. 3d at 662, 664. The court first concluded that Plaintiffs had Article III standing to bring claims on behalf of named Assignors and unnamed, "similarly situated" assignors. *Id.* at 650–51.

The court then considered whether Plaintiffs' RICO claims were barred by the indirect-purchaser rule, which the court analyzed as a question of Plaintiffs' statutory "RICO standing."[5] *Id.* at 651. The indirect-purchaser rule, as originally formulated in the antitrust context in *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), provides that "*indirect* purchasers"—i.e., those "who are two or more steps removed from the [antitrust] violator in a distribution chain"—"may not sue" for antitrust damages. *Apple Inc. v. Pepper*, 587 U.S. 273, 279 (2019) (citing *Illinois Brick*, 431 U.S. at 746). Because the civil RICO statute closely tracks federal antitrust statutes, several courts of appeal "have established a bright-

---

[5] The Supreme Court has cautioned that the terms "statutory standing" and "prudential standing" are "misleading" because "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014) (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002)); *see also CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011) (discussing the difference between constitutional standing and statutory standing, "which is perhaps best understood as not even standing at all"). The indirect-purchaser rule concerns who can sue under particular statutes, not whether courts can hear those claims as a constitutional matter.

10

line rule that bars RICO suits by indirect purchasers."[6] *Lundbeck*, 664 F. Supp. 3d at 651. The district court was inclined to agree with that rule, but ultimately proceeded to dismiss the complaint on different grounds: Plaintiffs' failure to adequately plead proximate causation, a necessary element of a RICO claim. *Id.* at 652, 654–59.

The district court emphasized that under Fourth Circuit and Supreme Court precedent, RICO's proximate-causation element "turns on the *directness* of the resultant harm, not the *foreseeability* of that harm." *Id.* at 656 (quoting *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 493 (4th Cir. 2018)); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). Plaintiffs' complaint failed that test, the court concluded, because its "alleged causal chain [was] too far attenuated": "based on the circumstances of this case, Plaintiffs cannot possibly" explain "how an estimated thousands of independent actors, like physicians and pharmacists, played into [their] injuries, or how Defendants' actions influenced these economic injuries." *Lundbeck*, 664 F. Supp. 3d at 659.

The district court further concluded that because proximate causation is a necessary element of Plaintiffs' state-law consumer-protection claims and its claim under a Florida RICO analogue, those claims must fail as well. *Id.* at 659–61. The court also dismissed

---

[6] *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 616 (6th Cir. 2004) ("[I]ndirect purchasers lack standing under RICO and the antitrust laws to sue for overcharges passed on to them by middlemen[.]"); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) ("[A]ntitrust standing principles," including the rule "taught by *Illinois Brick*," "apply to RICO claims, thereby denying RICO standing to indirect victims."); *Carter v. Berger*, 777 F.2d 1173, 1177 (7th Cir. 1985) ("[The] *Illinois Brick* rule promotes enforcement [of RICO] and therefore applies to RICO, too.").

Plaintiffs' unjust-enrichment claims as vague, unconnected to particular alleged wrongs, and barred by the principle that there can be no recovery for unjust enrichment alleged to arise from a contract. *Id.* at 660–61. Finally, the court concluded that, in light of "the facts and circumstances of this case," the "extensive[]" briefing before the court, and Plaintiffs' nationwide reputation for questionable "litigation strategies," any further amendment of the complaint would be futile. *Id.* at 664 & n.12. Accordingly, the court dismissed the case with prejudice. *Id.*

Plaintiffs subsequently filed a motion to alter or amend the judgment under Rule 59(e) or for relief from judgment under Rule 60(b). In the alternative, Plaintiffs sought leave to amend their complaint, and concurrently filed a proposed amended complaint. The district court denied the motion, and in doing so "clarifie[d] that it believe[d] that the" indirect-purchaser rule "[did], in fact, bar Plaintiffs' claims" because their Assignors were "indirect purchasers of Xenazine." *MSP Recovery Claims, Series LLC v. Lundbeck LLC*, No. 3:22-cv-422, 2024 WL 37208, at *4–5 (E.D. Va. Jan. 3, 2024).

Plaintiffs timely appealed the original order granting Defendants' motions to dismiss and denying Plaintiffs' motion for injunctive relief, and the subsequent order denying Plaintiffs' motion to alter or amend the judgment and for leave to amend the complaint.

II.

We begin with the district court's conclusion that Plaintiffs have Article III standing to bring claims on behalf of their Assignors, which we review de novo. *See Benham v. City of Charlotte*, 635 F.3d 129, 134 (4th Cir. 2011). While Defendants, on appeal, do not renew

12

the Article III standing objections expressed in their motions to dismiss, "federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).

"As the party invoking federal jurisdiction, [Plaintiffs have] the burden of demonstrating standing for each of [their] claims." *Episcopal Church in S.C. v. Church Ins. Co. of Vt.*, 997 F.3d 149, 154 (4th Cir. 2021). Because this appeal arises from an order granting motions to dismiss, "we accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party." *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013). However, we do not accept as true mere "legal conclusions" or "conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see David*, 704 F.3d at 333.

It is undisputed that Plaintiffs themselves were not injured by the scheme they allege; rather, they assert recovery rights assigned to them by contract.[7] Generally, "the

---

[7] While the parties have not briefed the issue in this appeal, and we are not aware of any circuit authority directly addressing the question, district courts are divided as to the assignability of RICO claims as a statutory matter. *See Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106, 112 (3d Cir. 1993) ("assum[ing]" that the express-assignment requirement that applies to antitrust claims also applies to RICO claims). *Compare MSP Recovery Claims, Series LLC v. Actelion Pharms. US, Inc.*, No. 3:22-cv-7604, 2024 WL 3408221, *20 (N.D. Cal. July 12, 2024) (concluding that civil RICO claims are not assignable despite "long line of precedent holding antitrust claims assignable"), *with MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, No. 3:18-cv-2211, 2019 WL 1418129, at *7 (D.N.J. Mar. 29, 2019) (permitting assignment of RICO claims as long as the assignment is "express"). We need not decide that issue in order to resolve this appeal. Assuming *arguendo* that RICO's

assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 286 (2008) (quoting *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000)). But "'[s]tanding is not dispensed in gross.' Rather, 'a plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citation omitted) (first quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); and then quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). And although "[a]n assignee stands in the shoes of the assignor," "the Court needs to know which shoes Plaintiffs claim to occupy." *MSP Recovery Claims, Series LLC v. Actelion Pharms. US, Inc.*, No. 22-cv-7604, 2023 WL 5725517, at *8 (N.D. Cal. Sept. 5, 2023) (cleaned up). While the Supreme Court has "emphasized the long history of allowing *contractual* assignees to bring suit based on an assignor's injuries," this Court has explained that without a "contractual agreement," there is "no basis" for assignee standing. *David*, 704 F.3d at 335–36 (emphasis added).

Here, the pleadings contain evidence of contractual assignments to Plaintiffs from five entities: SummaCare, Inc.; Interamerican Medical Center Group, LLC; Health First Health Plans, Inc.; Centro de Pediatricia y Medicina de Familia de Villalba, C.S.P.; and Sal Health Group, LLC. Plaintiffs' standing as assignees can extend no further than these contracts.

---

private cause of action permits Plaintiffs to pursue claims on behalf of their named Assignors, all of those claims fail for the reasons explained below. And even if RICO claims are unassignable, that defect is not jurisdictional. *See supra* n.5.

14

As other courts analyzing similar complaints by the same Plaintiffs have repeatedly concluded, Plaintiffs "must 'name' or otherwise identify every entity whose claims they assert," and they lack standing to bring claims on behalf of unnamed entities. *MSP Recovery Claims, Series LLC v. Pfizer, Inc.*, 728 F. Supp. 3d 89, 100 (D.D.C. 2024) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)); *see also Actelion*, 2023 WL 5725517, at *8 ("At a minimum, Plaintiffs must plead some specific facts alleging a specific named assignor assigned its claims to Plaintiffs via a valid assignment agreement."); *MSP Recovery Claims, Series LLC v. Jazz Pharms., PLC*, No. 5:23-cv-1591, 2023 WL 8600708, at *4 (N.D. Cal. Dec. 12, 2023) (concluding that "MSP lacks standing to bring claims on behalf of unidentified, unenumerated assignors"); *MSP Recovery Claims, Series LLC v. Amgen Inc.*, No. 2:23-cv-3130, 2024 WL 3464410, at *5, *7 (C.D. Cal. July 15, 2024) (similar); *MSP Recovery Claims, Series LLC v. Avanir Pharms., Inc*, No. 8:22-cv-1026, 2022 WL 17220647, at *4 (C.D. Cal. Oct. 20, 2022) (similar).

We agree. So, while we affirm Plaintiffs' Article III standing to bring claims on behalf of the five identified entities, we reverse the district court's conclusion that Plaintiffs have standing to bring claims on behalf of *unidentified* assignors. On remand, those claims should be dismissed without prejudice for lack of subject-matter jurisdiction.

## III.

Turning to the merits of Plaintiffs' claims brought on behalf of named Assignors, we review the district court's dismissal for failure to state a claim de novo. *Fairfax v. CBS Corp.*, 2 F.4th 286, 291 (4th Cir. 2021). We affirm.

15

A.

RICO provides a cause of action to "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C.] section 1962." 18 U.S.C. § 1964(c). Section 1962(c) prohibits the conduct of a "pattern of racketeering activity" affecting interstate commerce; Section 1962(d) prohibits conspiracy to engage in such conduct. The statute defines "racketeering activity" to include violations of 18 U.S.C. §§ 1341 (a mail fraud statute), 1343 (a wire fraud statute), and 1952 (the Travel Act). *Id.* § 1961(1). The Travel Act prohibits traveling in interstate commerce with intent to commit certain enumerated offenses, including "bribery." *Id.* § 1952.

To survive a motion to dismiss, a RICO claim must adequately plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (footnote omitted). Like the district court, we will "assume[] without deciding that Plaintiffs may have sufficiently alleged the existence of an 'association-in-fact' enterprise." *Lundbeck*, 664 F. Supp. 3d at 657 n.8. So, at issue here is whether the pattern of conduct alleged in the complaint constitutes "racketeering activity."

Plaintiffs allege that Defendants committed mail and wire fraud through "certifications by Lundbeck and CVC in which they claimed to be in compliance with federal law, including the [Anti-Kickback Statute] and [False Claims Act]." J.A. 72–73 ¶ 188. The complaint is vague about the nature and content of these "certifications."

Plaintiffs' theory appears to be that Defendants "caused pharmacies to seek reimbursement from federal health care programs for their purchases of Xenazine" through

16

claims that contained false statements. J.A. 59 ¶ 128. The false statements, according to Plaintiffs, were "implied certification[s] . . . that the claims complied with federal law, including the [Anti-Kickback Statute]."[8] *Id.* Plaintiffs—relying heavily on allegations made by DOJ in the 2019 no-fault settlement but never admitted to—claim that these implied certifications were false because Lundbeck's donations to CVC violated the Anti-Kickback Statute. The purportedly false implied certifications are the basis of Plaintiffs' RICO predicates of mail and wire fraud. Plaintiffs also allege that the donations constituted "bribery" in violation of the Travel Act, another RICO predicate.

Plaintiffs' alleged RICO predicates are shaky at best. That's because Federal Rule of Civil Procedure 9(b)'s "particularity standard is steep,"[9] and it is doubtful whether Plaintiffs have met it here. *United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 196 (4th Cir. 2022). Under Rule 9(b), a plaintiff who alleges fraud must identify "the time, place, and contents of the false representations, as well as the identity of the

---

[8] Though the complaint does not elaborate on this point, Plaintiffs' implied-certification theory appears to draw on the Supreme Court's holding that when "a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability [under the False Claims Act] if they render the defendant's representations misleading with respect to the goods or services provided." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 187 (2016). The False Claims Act prohibits the submission of false or fraudulent claims for payment to Medicare. *See* 31 U.S.C. §§ 3729–33. A "claim" "includes direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs," like Plaintiffs' Assignors. *Universal Health Servs.*, 579 U.S. at 182.

[9] Under Rule 9(b), an allegation of fraud must "state with particularity the circumstances constituting fraud or mistake," though "intent, knowledge, and other conditions of a person's mind may be alleged generally."

17

person making the misrepresentation and what he obtained thereby." *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 553 (4th Cir. 2019) (citation omitted). "To be convicted of mail fraud or wire fraud, a defendant must specifically intend to lie or cheat or misrepresent with the design of depriving the victim of something of value." *United States v. Wynn*, 684 F.3d 473, 478 (4th Cir. 2012). "When the claim hinges on an underlying kickback violation, the kickback scheme must be pleaded with particularity as well." *Nicholson*, 42 F.4th at 194–95. Plaintiffs' complaint offers scant detail about the misrepresentations underlying their fraud allegations, Defendants' specific intent regarding those communications (even if alleged generally), or the kickbacks Defendants are alleged to have paid and received.[10]

Similarly, Plaintiffs' allegation that CVC accepted money from Lundbeck in exchange for referring patients to Xenazine likely fails to make out a Travel Act predicate. "Bribery" under the Travel Act means "generic" bribery. *Perrin v. United States*, 444 U.S. 37, 49 (1979). "A person commits generic bribery when 'he solicits, accepts, or agrees to accept any benefit as consideration for knowingly violating or agreeing to violate a duty of fidelity,' either as a public servant or as a private individual holding certain positions of trust." *Pfizer*, 728 F. Supp. 3d at 108 (quoting Model Penal Code § 224.8 (Am. L. Inst. 1980)). Plaintiffs' complaint does not "plead facts suggesting that [CVC] owed a duty of fidelity to anyone to abstain from" referring patients to Xenazine. *Id.* at 109.

But we need not decide whether those predicate allegations withstand scrutiny,

---

[10] We note that the First Circuit recently affirmed the dismissal of a complaint alleging a similar co-payment charity scheme on Rule 9(b) grounds. *See Biogen*, 126 F.4th at 98, 103–08.

18

because all of Plaintiffs' RICO allegations fail for the reason identified by the district court: Plaintiffs do not plausibly allege that Defendants' conduct proximately caused Assignors' injuries.

## B.

Regarding the sufficiency of proximate cause allegations in RICO claims, the Supreme Court held in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), that a civil RICO claim requires "a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." *Id.* at 268. Recently, in *Albert v. Global Tel\*Link*, 68 F.4th 906 (4th Cir. 2023), we interpreted *Holmes* to mean that "RICO proximate causation is lacking when (1) there is a 'more direct victim' from whom (or intervening factor from which) the plaintiff's injuries derive, or (2) the alleged RICO predicate violation is 'too distinct' or logically unrelated from the cause of the plaintiff's injury." *Id.* at 911.

In the first type of case we identified in *Albert*—a "more direct victim" or "intervening factor" case—proximate cause is lacking because "the plaintiff's injuries derive from those suffered by parties more closely or directly victimized by the defendant's wrongdoing." *Id.* In *Holmes*, for example, the Securities Investor Protection Corporation alleged that a "stock-manipulation scheme" caused two broker-dealers to go out of business, preventing them from paying their customers' claims, "thus triggering [the plaintiff]'s statutory duty to advance funds to reimburse the customers." *Holmes*, 503 U.S. at 261. The Supreme Court held that the Securities Investor Protection Corporation could not establish proximate causation because the broker-dealers were a more direct victim of

19

the alleged scheme. *Id.* at 271; *see Albert*, 68 F.4th at 911.

Similarly, in *Slay's Restoration, LLC v. Wright National Flood Insurance Co.*, 884 F.3d 489 (4th Cir. 2018), we explained that "regardless of how foreseeable a plaintiff's claimed injury might be or even what motive underlaid the conduct that caused the harm, the injury for which a plaintiff may seek damages under RICO cannot be contingent on or derivative of harm suffered by a different party." *Id.* at 494. Thus, the plaintiff in that case—a subcontractor injured when a flood insurance company and its consultants allegedly underpaid a claim submitted by the prime contractor's client—could not sue the insurer and its consultants under RICO, even though the plaintiff "was the *expected* recipient of insurance funds." *Id.*

In the second type of case we identified in *Albert*—a "too distinct" case—proximate cause is lacking because "the alleged RICO violation is too logically unrelated to the direct cause of a plaintiff's injuries." *Albert*, 68 F.4th at 912. For example, in *Anza v. Ideal Steel Supply Corp.*, the plaintiff "alleged that its competitor violated RICO by deliberately failing to charge taxes on cash transactions and submitting false tax returns to hide the scheme," causing the plaintiff "to lose customers and sales to the defendant." *Id.* (citing *Anza*, 547 U.S. at 454). "The Supreme Court held there was no RICO proximate causation because the alleged violation (submitting false tax returns) defrauded the state, but [the plaintiff's] injury came from losing customers, which was too distinct from the tax fraud." *Id.* (citing *Anza*, 547 U.S. at 457–58). Similarly, in *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010), the Supreme Court held that New York City was not *directly* injured when a retailer failed to make legally required disclosures that would facilitate the City's

recovery of unpaid taxes from the retailer's customers. *Id.* at 11. Instead, "the conduct directly responsible for the City's harm was the customers' failure to pay their taxes." *Id.* The *Hemi Group* majority expressly rejected the dissent's argument that "RICO's proximate cause requirement turn[s] on foreseeability, rather than on the existence of a sufficiently 'direct relationship' between the fraud and the harm." *Id.* at 12; *cf. id.* at 22–26, 28 (Breyer, J., dissenting).

As the district court recognized in its order denying post-judgment relief, this case involves both types of proximate-causation issues. *Lundbeck*, 2024 WL 37208, at *4. To the extent Plaintiffs were injured by reimbursing Xenazine claims at prices inflated by Defendants' conduct, the alleged scheme has more direct victims. The complaint does not allege that Assignors bought anything from Lundbeck; rather, Lundbeck "sold [Xenazine] to distributors, who sold to pharmacies, who sold to doctors and patients, who triggered the named assignors' payments back to the pharmacies." *Pfizer*, 728 F. Supp. 3d at 106 (summarizing the allegations of a similar complaint brought by the same Plaintiffs); *accord United Healthcare Servs., Inc. v. United Therapeutics Corp.*, No. 8:22-cv-2948, 2024 WL 1256266, at *12 (D. Md. Mar. 25, 2024). If Defendants' actions permitted Lundbeck to artificially inflate the price of Xenazine, distributors and wholesalers paid those prices first. Whether these purchasers in fact benefited from increased volumes, as Plaintiffs argue, is beside the point; their purchases break the chain of causation between Lundbeck's alleged statutory violations and Assignors' injuries. Assignors "only paid more claims for [Xenazine], at higher prices, because pharmacies bought more [Xenazine], at higher prices." *United Healthcare*, 2024 WL 1256266, at *12.

21

Similarly, Plaintiffs cannot plausibly allege that Defendants' actions directly increased the *volume* of Xenazine prescriptions that Assignors were ultimately obligated to reimburse. Xenazine prescriptions may have risen for any number of "other easily inferable reasons," including "an uptick in [Huntington's disease] patients or a lack of competing generic drugs on the market due to [Lundbeck's exclusive] patent enforceability rights." *MSP Recovery Claims, Series LLC v. Caring Voice Coal., Inc.*, No. 1:21-cv-21317, 2022 WL 3155035, at *11 (S.D. Fla. July 21, 2022), *report and recommendation adopted*, 2022 WL 4448256 (S.D. Fla. Sept. 23, 2022). Even if Defendants' conduct exerted upward pressure on Xenazine demand, "licensed physicians, pharmacies, and other healthcare actors must still prescribe and administer medications." *Lundbeck*, 664 F. Supp. 3d at 657 (quoting *Caring Voice Coal.*, 2022 WL 3155035, at *11). Prescription volumes therefore depend on the intervening decisions of doctors, who owe an independent duty of care to their patients. Plaintiffs do not allege that Defendants caused Xenazine to be improperly or fraudulently prescribed, and there is no practical way to "determine what portion of [Xenazine prescriptions are] attributable to [Lundbeck's donations to CVC], as opposed to other, independent factors." *Slay's Restoration*, 884 F.3d at 494.

Plaintiffs' remaining theories involve predicate violations that are too distinct from Plaintiffs' injuries to support RICO liability. Plaintiffs allege that Defendants caused pharmacies to submit claims for reimbursement to Assignors that were "tainted" by "false certifications" of compliance with the Anti-Kickback Statute and therefore categorically "unpayable." J.A. 306, 309. As an initial matter, to call the claims "tainted" by "false certifications" assumes that a violation of the Anti-Kickback Statute in fact occurred. But

22

no such violation has been established; Defendants settled the government's Anti-Kickback allegations without admitting fault.

In any event, the complaint does not clearly allege that Defendants made particular false statements to Assignors that cost them money. Rather, Plaintiffs allege that Defendants "caused pharmacies" to submit claims for reimbursement that contained implied certifications of compliance with federal law, which they further allege—in a conclusory fashion—to be false. J.A. 59 ¶ 128. True, as Plaintiffs point out, "first-party reliance" on a fraudulent misrepresentation is not a necessary element of a civil RICO claim. *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 649 (2008). But as one district court observed in dismissing a similar lawsuit, Plaintiffs' complaint does not detail "what [Defendants] certified, when, where, or to whom, . . . how any alleged misrepresentations reached [Assignors], or what role these misrepresentations played in [Assignors'] decision-making." *United Therapeutics*, 2024 WL 1256266, at *7; *see also Humana Inc. v. Biogen, Inc.*, 126 F.4th 94, 105 (1st Cir. 2025) ("[I]t is not enough to make conclusory assertions that fraudulent certifications were made, without identifying the fraudulent statement itself."). Plaintiffs never connect any particular misrepresentation to any particular economic injury, and thus fail to establish the necessary "*direct* relation between the injury asserted and the injurious conduct alleged." *Slay's Restoration,* 884 F.3d at 493 (quoting *Holmes*, 503 U.S. at 268). The causal chain running from Defendants' donations and alleged misrepresentations to Assignors' Xenazine reimbursement expenses is simply too attenuated to support RICO liability.

In their motion for post-judgment relief and proposed amended complaint, Plaintiffs

23

allege that some Assignors received reimbursement claims from TheraCom and paid TheraCom directly for Xenazine. As Defendants point out, Plaintiffs made the same argument in their Motion to Supplement the Complaint, citing as evidence the same spreadsheet purporting to contain internal client data identifying representative Xenazine claims. The district court granted that motion, but concluded that the purported claims data did not remedy Plaintiffs' failure to state a claim.

We agree. As the district court explained, "[e]ven assuming Plaintiffs can demonstrate that their Assignors reimbursed [TheraCom] for Xenazine, Plaintiffs' conclusory allegations that Defendants' unlawful conduct—based on a no-fault settlement with the DOJ—influenced Plaintiffs' Assignors to purchase *more* Xenazine and Xenazine at *supra-competitive prices* is not enough" to state a RICO claim. *Lundbeck*, 664 F. Supp. 3d at 663.

Further, Plaintiffs' objection that proximate causation is often a jury question is unavailing. A plaintiff who does not allege an injury proximately caused by a predicate RICO violation cannot "make out a right to sue" under RICO at all, *Holmes*, 503 U.S. at 276, which is why *Holmes* and *Slay's Restoration* directed the dismissal of civil RICO claims for lack of proximate causation on the pleadings, *see id.*; *Slay's Restoration*, 884 F.3d at 495; *see also Assurance Co. of Am. v. York Int'l, Inc.*, 305 F. App'x 916, 925 (4th Cir. 2009) (unpublished table decision) ("Even though the issue of proximate causation is generally left to a jury, if the evidence can lead to no other conclusion, then causation can be decided as a matter of law.").

We do not suggest that the conduct alleged is entirely innocuous. The "potential for

24

fraud and abuse" resulting from collusion between pharmaceutical manufacturers and PAPs is evident. 2005 OIG Guidance at 70624. If the allegations resulting from the DOJ's investigation of Lundbeck and CVC are true, Plaintiffs' Assignors may well have incurred higher Xenazine reimbursement expenses, and that economic injury may well have been a foreseeable result of Defendants' conduct.

Nevertheless, not "all factually injured plaintiffs [may] recover" RICO damages. *Holmes*, 503 U.S. at 266. None of Plaintiffs' theories allege a harm to Assignors that is "sequentially the direct result" of a statutory violation by Defendants. *Slay's Restoration*, 884 F.3d at 494. Plaintiffs' inflated-prices theory has more direct victims, its inflated-volumes theory is derailed by intervening factors, and its tainted-claims theory depends on RICO predicates that are too distinct from Plaintiffs' injuries. In an attempt to leverage the Medicare fraud alleged by DOJ into a private cause of action, Plaintiffs stretch civil RICO liability beyond its limits.[11] We therefore affirm the district court's dismissal of their

---

[11] Because we affirm on proximate-causation grounds, we do not reach the district court's alternative grounds for dismissal—that Plaintiffs' RICO claims are barred by the indirect-purchaser rule. While we appear to have applied a similar principle to civil RICO claims in one previous case, *Bank of North Carolina v. Tiller*, 814 F.2d 931 (4th Cir. 1987), *overruled in part on other grounds by Busby v. Crown Supply, Inc.*, 896 F.2d 833, 841 & n.8 (4th Cir. 1990) (en banc), this is a complicated question on which courts have taken diverging views. Some courts have applied the rule, with varying degrees of hesitancy. *Compare Trollinger*, 370 F.3d at 616 (holding that the indirect-purchaser rule applies to all civil RICO claims), *McCarthy*, 80 F.3d at 855 (same), *Carter* 777 F.2d at 1177 (same), *In re: Zantac (Ranitidine) Prods. Liab. Litig.*, 546 F. Supp. 3d 1216, 1225 (S.D. Fla. 2021) (adopting "the prevailing view that the indirect purchaser rule applies to RICO claims"), *In re: Takata Airbag Prods. Liab. Litig.*, 524 F. Supp. 3d 1266, 1285 (S.D. Fla. 2021) (concluding that the indirect-purchaser rule "appl[ies] in the RICO context as well"), *and Harris County v. Eli Lilly & Co.*, No. 4:19-cv-4994, 2020 WL 5803483, at *12 (S.D. Tex. Sept. 29, 2020) (following "the three circuit courts that have addressed this issue"

25

federal RICO claims.[12]

C.

Plaintiffs' claim under Florida's RICO statute, the Civil Remedies for Criminal

Practices Act, Fla. Stat. § 772.101 *et seq.*, fails for the same reasons. That is because

"interpretation of Florida's RICO law 'is informed by case law interpreting the federal

RICO statute' on which it is patterned." *Omnipol, A.S. v. Multinational Def. Servs., LLC*,

32 F.4th 1298, 1308 (11th Cir. 2022) (quoting *Jones v. Childers*, 18 F.3d 899, 910 (11th

Cir. 1994)); *see Gross v. State*, 765 So. 2d 39, 42 (Fla. 2000) ("The Florida RICO statute

was largely modeled after the Federal RICO Statute. . . . Given the similarity of the state

---

rather than "the minority rule"), *with Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 604 & n.6 (6th Cir. 2024) (applying the indirect-purchaser rule pursuant to *Trollinger*, but calling a bright-line rule "unsupported by sensible principles" as applied to "interdependent vertical economic structures"), *Humana, Inc. v. Biogen*, 666 F. Supp. 3d 135, 152–54 (D. Mass 2023) (applying the indirect-purchaser rule in deference to "every circuit to have considered the issue," but noting several "reasons to carve out an exception" in the healthcare-reimbursement context), *and Biogen*, 126 F.4th at 101 n.5 (1st Cir. 2025) (declining to reach the district court's reluctant application of the indirect-purchaser rule and affirming on other grounds). Other courts have expressly declined to apply the indirect-purchaser rule to RICO claims. *See Caring Voice Coal.*, 2022 WL 3155035, at *12 n.3 (declining to apply the indirect-purchaser rule in the RICO context); *GolTV, Inc. v. Fox Sports Latin Am., Ltd.*, No. 1:16-cv-24431, 2018 WL 1393790, at *19 (S.D. Fla. Jan. 26, 2018) (noting lack of Eleventh Circuit precedent applying "the antitrust standing doctrine to RICO claims"); *Amgen*, 2024 WL 3464410, at *10 (declining to apply the indirect-purchaser rule because "insurers do pay for a portion of the medication cost and can thus be considered a 'purchaser' in part"); *In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1325 (D. Kan. 2018) (applying traditional proximate-cause inquiry rather than indirect-purchaser rule in RICO context).

[12] "Because the pleadings do not state a substantive RICO claim under § 1962(c), Plaintiffs' RICO conspiracy claim fails as well." *GE Inv. Priv. Placement Partners II v. Parker*, 247 F.3d 543, 551 n.2 (4th Cir. 2001).

26

and federal statutes, Florida courts have looked to the federal courts for guidance in construing RICO provisions."); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004) (explaining that "the analysis we apply to the plaintiffs' federal RICO claims is equally applicable to their [Florida] state RICO claims"); *Holston v. Dawson*, No. 22-11198, 2023 WL 7485227, at *8 (11th Cir. Nov. 13, 2023) (per curiam) ("[A] Florida RICO claim . . . is analyzed under the same standards as federal RICO claims[.]"); *Ferrell v. Durbin*, 311 F. App'x 253, 256 n.5 (11th Cir. 2009) (per curiam) ("Florida RICO cases follow Federal RICO cases."). Plaintiffs make no argument that Florida courts would view proximate causation under Florida RICO more broadly than the Supreme Court and this Court have understood it pursuant to the federal RICO statute. Accordingly, we affirm the district court's dismissal of this claim as well.

## IV.

Plaintiffs also appeal the dismissal of their state-law consumer-protection claims arising under the laws of Connecticut, Florida, Illinois, Massachusetts, Michigan, New York, Ohio, and Wisconsin.[13]

Like other complaints filed by the same plaintiffs in related suits, the complaint "does little more than list a couple dozen state statutes in alphabetical order by state," and then "baldly asserts that the defendants' violations of those statutes proximately caused

---

[13] Plaintiffs have abandoned their claims arising under the laws of California, Pennsylvania, Puerto Rico, and South Carolina. *See* Opening Br. at 5 n.3; *United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) ("It is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned.").

their injuries." *United Healthcare*, 2024 WL 1256266, at \*19 (quoting *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 163 (2d Cir. 2016)). Plaintiffs make no more than a cursory effort to show that their allegations "satisfy the statutory requirements of the laws of the States they are invoking," and therefore they "may not seek relief . . . under those States' statutes." *Mayor of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123, 134 (4th Cir. 2021).

For example, the complaint contains no factual allegations to support Plaintiffs' assertion that their Assignors reimbursed pharmacies for Xenazine in any one of these states. Instead, each of Plaintiffs' state consumer-protection claims simply asserts, without explanation or evidence, that "Plaintiffs' analysis of its Assignors' data identified one or more purchases of Xenazine in the State of [e.g.] Connecticut." J.A. 81 ¶ 231; *see also* J.A. 82–92 ¶¶ 242, 251, 262, 272, 279, 292, 334. The complaint contains no documentation or details about these alleged "purchases of Xenazine," such as the dates of purchase or reimbursement, the price paid, the pharmacy that submitted the claim, or the doctor who prescribed the drug. The supplement to the complaint (J.A. 224–36), an inscrutable spreadsheet purporting to detail "specific Xenazine claims [reimbursed] by the Assignors," does not provide any of these details either. J.A. 218. On this record, we cannot determine whether any of Plaintiffs' named Assignors incurred Xenazine reimbursement expenses in any of the states whose consumer protection laws they invoke.[14]

---

[14] Aside from the question of purchases, Plaintiffs have alleged no facts suggesting that any named Assignor resides in any of the states whose consumer protection laws they invoke on appeal, except Florida and Ohio. SummaCare is an Ohio corporation, while

Plaintiffs' state-law unjust-enrichment claims are even more sparsely pleaded, omitting even "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiffs cite no particular state law or statute; they simply reassert that their Assignors reimbursed for Xenazine in a list of twelve states, and then claim that Defendants' profits from Xenazine overcharges are unlawful under "the laws of all states and territories in the United States, except Ohio and Indiana." J.A. 93–94.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678. In light of the sparseness of these claims and the causation issues already discussed, the district court was justified in concluding that Plaintiffs fail to state any state-law consumer-protection or unjust-enrichment claims.[15]

V.

Finally, Plaintiffs argue that the district court abused its discretion in denying their motion to alter or amend the judgment or for relief from judgment, dismissing the case

---

Health First Administrative Plans and Sal Health Group are Florida corporations. Interamerican Medical Center Group's place of business is not evident from the pleadings, but public records show that it is also a Florida corporation. Centro de Pediatricia is a Puerto Rico corporation, but as noted, Plaintiffs do not press their claim based on Puerto Rican law on appeal.

[15] Because Plaintiffs fail to state any claims upon which relief may be granted, their motion for a temporary restraining order and preliminary injunction preventing Adira Foundation from dissolving (or ordering its reinstatement) is denied as moot. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits[.]").

29

with prejudice, and denying leave to amend the complaint. We disagree.

A "ruling on [a] Rule 59(e) motion merges with the prior determination, so that the reviewing court takes up only one judgment," and courts "address[] any attack on the Rule 59(e) ruling as part of its review of the underlying decision." *Banister v. Davis*, 590 U.S. 504, 509 (2020). And Rule 60(b) does not authorize "reconsideration of legal issues already addressed in an earlier ruling." *CNF Constructors, Inc. v. Donohoe Const. Co.*, 57 F.3d 395, 401 (4th Cir. 1995). Plaintiffs' motion criticized the district court's reasoning but raised no new issues. The district court did not abuse its discretion in rejecting it.

Nor did the district court abuse its discretion in dismissing Plaintiffs' claims on behalf of the five named Assignors with prejudice. "In the Fourth Circuit, district courts are not required to give plaintiffs one without-prejudice ruling on the merits before dismissing with prejudice." *Nicholson*, 42 F.4th at 196. "District courts have inherent power to manage their dockets with an eye toward speedy and efficient resolutions, and part of that power is the use of with-prejudice dismissals. So we review decisions about the nature of a dismissal—even a very first dismissal—for an abuse of discretion." *Id.* (citation omitted).

The district court explained that its decision to dismiss with prejudice was based on the "extensive[] brief[ing]" it had reviewed, including "three separate Motions to Dismiss," "88 pages in opposition, with 25 separate exhibits," sur-replies and responses to the sur-replies, oral argument, and a motion to supplement the Complaint (which it granted). *Lundbeck LLC*, 664 F. Supp. 3d at 664. And we agree with the district court that "even if Plaintiffs could access more data" suggesting that Assignors reimbursed for Xenazine

30

prescriptions, they would "nonetheless fail to state a claim" because their theories of injury are too attenuated. *Id.* at 663. The district court did not abuse its discretion in concluding that dismissal with prejudice was warranted.

Finally, the district court did not abuse its discretion in denying leave to amend the complaint. "[A] post-judgment motion to amend is evaluated under the same legal standard as a similar motion filed before judgment was entered—for prejudice, bad faith, or futility." *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) (en banc). "Although such motions should be granted liberally, a district court may deny leave if amending the complaint would be futile—for example, if the proposed amended complaint fails to satisfy the requirements of the federal rules," including Rule 12(b)(6). *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) (quotation marks omitted). "Regardless of whether the motion to amend is filed pre- or post-judgment, we review for abuse of discretion the district court's decision on a motion to amend." *Laber*, 438 F.3d at 428.

Here, the district court was justified in concluding that further amendment would be futile. Plaintiffs' proposed amended complaint alleges the same basic scheme as their original complaint, and therefore fails to remedy the fundamental problems of proximate causation that afflict their federal and Florida RICO claims. As the district court properly concluded, Plaintiffs "cannot possibly show that Defendants' alleged violation[s] 'directly' led to [their] alleged injuries." *Lundbeck*, 2024 WL 37208, at *3. Nor does the proposed amended complaint remedy the pleading deficiencies in Plaintiffs' conclusory state-law consumer-protection and unjust-enrichment claims.

31

As other courts have observed, "this is far from [Plaintiffs'] first rodeo." *Pfizer*, 728 F. Supp. 3d at 113 (quoting *MSP Recovery Claims, Series LLC v. AIG Prop. Cas. Co.*, No. 20-cv-2102, 2021 WL 1164091, at *15 (S.D.N.Y. Mar. 26, 2021)). Similar claims (including in amended complaints) by the same plaintiffs, alleging the same basic scheme, have been dismissed in at least a dozen separate orders by district courts around the country. *See supra* n.4. Plaintiffs' proposed amended complaint is more of the same. "Because [Plaintiffs'] proposed amended complaint does not properly state a claim under Rule 12(b)(6) . . . , we find the district court correctly determined that further amendment would be futile." *Wilson*, 525 F.3d at 376.

## VI.

We reverse the district court's conclusion that Plaintiffs have Article III standing to bring claims on behalf of unidentified assignors. On remand, those claims should be dismissed without prejudice for lack of subject-matter jurisdiction. We otherwise affirm the district court's order dismissing Plaintiffs' complaint with prejudice and denying its motion for injunctive relief, as well as its order denying post-judgment relief and leave to amend the complaint.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*